## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

GARY ROUNDTREE, OLLIE DAILEY,       §
GERRY LEWIS, ANTONIO JAMES,         §
COREY POLITE, HEATHER DAVIS,        §
LATOYA STUART, SYLVIA               §
MATTHEWS, MARIAN PAYNE, and         §
BILLY KELLY,                        §
                                    §      Civil Action 3:22-cv-2675
    *Plaintiffs*,                  §
                                    §
vs.                                 §
                                    §
RAYTHEON TECHNOLGIES CORP.,         §      **JURY DEMANDED**
                                    §
    *Defendant.*                   §

## PLAINTIFFS' FOURTH AMENDED COMPLAINT AND JURY DEMAND

TO THE HONORABLE BARBARA M. G. LYNN:

Plaintiffs Gary Roundtree, Ollie Dailey, Gerry Lewis, Antonio James, Corey Polite, Heather Davis, Latoya Stuart, Silvia Matthews, Marian Payne, and Billy Kelly presents their Complaint for unlawful discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981. This amended complaint is filed to comply with the Court's Order dated June 21, 2024. ECF No. 84.

### PARTIES

1.    Gary Roundtree is a citizen and resident of the United States, residing Dallas County, Texas.

2.      Ollie Dailey is a citizen and resident of the United States, residing Dallas County, Texas.

3.      Gerry Lewis is a citizen and resident of the United States, residing Dallas County, Texas.

4.      Antonio James is a citizen and resident of the United States, residing Dallas County, Texas.

5.      Corey Polite is a citizen and resident of the United States, residing Kauffman County, Texas.

6.      Heather Davis is a citizen and resident of the United States, residing Denton County, Texas.

7.      Latoya Stuart is a citizen and resident of the United States, residing Dallas County, Texas.

8.      Sylvia Matthews is a citizen and resident of the United States, residing Dallas County, Texas.

9.      Marian Payne is a citizen and resident of the United States, residing Dallas County, Texas.

10.     Billy Kelly is a citizen and resident of the United States, residing Dallas County, Texas.

11.     Each of the Plaintiffs are Black or African American.

12.     Raytheon Technologies Corporation is a foreign corporation and has appeared in this case.

13.     Raytheon employed Mr. Roundtree, Mr. Dailey, Mr. Lewis, Mr. James, and Mr. Polite as machinists (the "Machinists"). At the time of the Original Complaint, they were employed by Raytheon; however, Raytheon terminated the employment of Mr. Lewis, Mr. James, and Mr. Polite. Mr. Roundtree and Mr. Daily have found other employment. Raytheon treated similarly situated employees who are not Black and who have not reported or opposed discrimination better than the Plaintiffs.

14.     Raytheon promised the Machinists a retention bonus if they stayed employed until Raytheon shut down the facility at which they worked. After the Machinists relied upon the promise to their detriment, Raytheon refused to pay the retention bonus unless the Machinists released their claims.

15.     Raytheon employed Ms. Davis, Ms. Stuart, Ms. Matthews, Ms. Payne, and Mr. Kelly as accountants, designating them as temporary employees, along with similarly situated employees who are not Black (the "Accountants").

16.     Raytheon terminated the Accountants but did not terminate similarly situated employees who were not Black, changing their status from temporary to

permanent employees. Raytheon terminated Ms. Davis later than the other Accountants, after she complained of discrimination.

## JURISDICTION AND VENUE

17.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331.

18.     This is a suit authorized and instituted pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981; and declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

19.     Venue of this Court is pursuant to 28 U.S.C. § 1391(b), the judicial district in which a substantial part of the events giving rise to this claim occurred.

## BACKGROUND

### Foreseeability of the Problem

20.     Discrimination and retaliation are foreseeable because businesses know that discrimination and retaliation are prevalent in the United States.

### The Purpose of the Law

21.     Foreseeability is important because the law is meant to be preventative.

22.     The federal anti-discrimination laws' primary objectives are prophylactic, chiefly aimed not to provide redress but to avoid harm.

23.     Prevention is the best tool to eliminate discrimination and retaliation in the workplace.

24.     Employers must take appropriate steps to prevent and correct discrimination and retaliation, including unlawful harassment.

25.     Corporations may be liable for punitive damages who do not make good-faith efforts to prevent discrimination in the workplace to accomplish the objective of motivating employers to detect and deter discrimination violations.

26.     The right to expect that corporations hire managers and human resources (HR) representatives qualified to recognize and prevent discrimination and retaliation is essential to our community.

27.     The right to expect that corporations will adequately train managers and HR representatives to recognize and prevent discrimination and retaliation is essential to our community.

28.     The right to expect that corporations will supervise managers and HR representatives to recognize and prevent discrimination and retaliation is essential to our community.

29.     The right to expect that corporations will not discriminate in pay, promotion, transfer, discipline, work environment, or termination of employment is essential to our community.

30.     The right to expect that corporations will not retaliate against persons who report, in good faith, signs or red flags of discrimination or retaliation is essential to our community.

**Raytheon Is a Global Corporation**

31.     Raytheon is a global corporation providing military products and services to countries around the world, such as Saudi Arabia, Australia, the United Kingdom, Poland, and many other countries, not the least of which is the United States.

32.     Although Raytheon is a defense contractor for many countries, it is independent and flies its own flag.

33.     Raytheon knows that discrimination and retaliation are foreseeable as potential problems in its work and business place.

34.     Raytheon intentionally discriminates against Black employees.

35.     Raytheon's EEO-1 reports show the disparity.

**Raytheon's Serious System Failure**

36.     Raytheon has a system, scheme, or plan of discriminating against persons based on race and retaliating against persons when they oppose or report violations.

37.     Raytheon fails to follow its written policies prohibiting discrimination and retaliation laws.

38.     Raytheon hires managers and HR personnel who are not qualified to recognize and prevent discrimination and retaliation.

39.     Raytheon fails to adequately train its managers and HR personnel to recognize and prevent discrimination and retaliation.

40.     Raytheon fails to supervise its managers and HR personnel to ensure that they recognize and prevent discrimination and retaliation laws.

41.     Raytheon fails to monitor the workplace for signs, symptoms, and red flags of discrimination and retaliation.

**Consequences of Failure to Enforce**

42.     The result is that Raytheon treats employees and agents differently because of their race and then disciplines and terminates the employees and agents after the employees and agents report concerns of violations.

43.     Raytheon has a contractual employment relationship with Plaintiffs.

44.     The term or length of the contractual relationship was or is terminable at the will of either Raytheon or Plaintiffs, except that Raytheon cannot terminate the relationship for an illegal purpose, such as a violation of the Civil Rights Act of 1866.

45.     Raytheon discriminated against the Plaintiffs because of their race.

46.     When some of the Plaintiffs reported and opposed discrimination, Raytheon retaliated against them.

47.     The Civil Rights Act of 1866 is one of the most important laws in our country, obtained at the cost of a Civil War.

48.     Laws such as the Civil Rights Act of 1866 often are not enforced unless persons like the Plaintiffs have the courage to file lawsuits to enforce the law.

49.     Congress intended to empower individuals to act as private attorneys general in enforcing discrimination and retaliation laws.

50.     Plaintiffs are acting as private attorneys general in this case to enforce the law and aid in effectuating important congressional and public policies of the highest priority.

51.     Raytheon has a pattern or practice of discrimination against a group of Black or African American employees.

52.     Raytheon has a pattern or practice of retaliation against persons who oppose race discrimination.

53.     Raytheon engages in discrimination and retaliation against a group of African American persons.

54.    Raytheon's discriminatory and retaliatory actions are its regular practice, rather than an isolated instance.

55.    Raytheon has a policy of discriminating and retaliating.

**THE MACHINISTS**

56.    Raytheon employed the Machinists at its Missile and Defense plant located at 6000 Lemmon Ave., Dallas, Texas.

57.    When Raytheon hired each of the Machinists, it knew that it paid Black employees less and promoted them less than other employees.

58.    Raytheon's employment data at the time of the hires showed the disparity.

59.    Raytheon knew it had a long history of race discrimination.

**Gary Roundtree**

60.    Mr. Roundtree worked as a Machinist for Raytheon since October 2017.

61.    Mr. Roundtree recognized and witnessed discrimination six months to a year into his employment.

62.    Around this time, a White employee called a Black employee the N-word.

63.    Mr. Roundtree reported this to his supervisor, Scott Galloway, in the Spring of 2018.

64.    Mr. Galloway was swept the matter under the rug.

65.    Also, about six months into Mr. Roundtree's employment, he recommended a White friend, Paul Winters, for a machinist position who had less than half the experience of Mr. Roundtree.

66.    Raytheon offered Mr. Winters an hourly rate higher than Mr. Roundtree, $1.00 or $1.50 an hour more than Mr. Roundtree.

67.    Raytheon hired Mr. Winters at a higher hourly rate than Mr. Roundtree.

68.    Mr. Roundtree cannot recall at this time whether he made the report of discrimination to Mr. Galloway before or after Raytheon selected Mr. Winters for the position.

69.    However, Mr. Roundtree applied for the Senior Machinist position repeatedly throughout his employment with Raytheon.

70.    Mr. Roundtree has been performing the duties of a Senior Machinist, yet Raytheon has not offered to pay Mr. Roundtree the pay associated with the position.

71.    Raytheon pays similarly situated employees, Senior Machinists, with responsibilities identical to Mr. Roundtree, more than Mr. Roundtree, even though they have less experience.

72.    Disparate treatment is discriminatory.

73.    Raytheon should have promoted Mr. Roundtree to a Senior Mechanist position with the appropriate pay three to four years ago when he started requesting the promotion.

74.    Raytheon continued to treat Mr. Roundtree differently because he is Black, differently than similarly situated employees who are not Black with no believable non-discriminatory reason.

75.    Mr. Roundtree has over 36 years of machinist experience.

76.    Mr. Roundtree's previous supervisor, Scott Fleming, said that his hands were tied and that there was no way to submit his promotion.

77.    The discrimination starts and is allowed at the highest levels at Raytheon who know and perpetuate it.

78.    Mr. Roundtree reported the pay disparity to Bethany Schutte, an HR partner for Raytheon, on March 22, 2023.

79.    Ms. Schutte replied by stating that Mr. Roundtree's pay is in line with his peers.

80.    This is not true, and Raytheon knows this.

81.    Raytheon's records will show that this is not true.

82.    Only one of Mr. Roundtree's peers has 36 or more years of experience as a Machinist, Mr. Dailey, is also Black and has faced the same discrimination.

83.    Mr. Roundtree replied to HR, letting HR know that he was disappointed and that he wanted to be treated fairly and equally.

84.    Mr. Roundtree informed HR that he has not been treated fairly or equally since he started his employment with Raytheon.

85.    Mr. Roundtree informed HR that he would nevertheless continue to give 110 percent to Raytheon, because he is a dedicated employee even though his dedication is met with discrimination because of his race.

86.    In 2022, Tucker Waugh, a 27-year-old, a White male was promoted to a supervisor position with no experience.

87.    Raytheon promoted Mr. Waugh over a White female and a Black female who both had more experience than Mr. Waugh.

88.    Raytheon refused to give him the position.

89.    Raytheon gave the White employee and an Asian employee each the position, although they had less qualifications than Mr. Roundtree.

90.    Sometime in 2022, Mr. Roundtree messaged HR representative Taylor Vanloo regarding a senior machinist compensation.

91.    Ms. Vanloo stated that it would be up to the supervisors to increase compensation for employees.

92.    None of the supervisors have promoted Mr. Roundtree or given him the compensation for which he is qualified.

93.    The reason is because Mr. Roundtree is Black and protests the discrimination.

94.    Raytheon has promoted non-supervisors who are not as qualified as Mr. Roundtree.

95.    Raytheon does not have a believable reason for not promoting Mr. Roundtree as the same as similarly situated employees who are not Black.

96.    On October 5, 2022, Mr. Roundtree sent a report of the discrimination and retaliation of the Machinist Plaintiffs to Wes Kremer, President of Raytheon Missiles & Defense.

97.    A copy of the report is attached as an Exhibit to this complaint.

98.    Mr. Roundtree reported the race discrimination and retaliation in a statement given to Mr. Shardonofsky, Raytheon's counsel and investigator on about October 24, 2022.

99.    Mr. Roundtree reported race discrimination and retaliation to Raytheon's counsel at this time on October 24, 2022, and again in November 2022.

100.   The lawsuit was filed on November 30, 2022.

101.   The lawsuit is protected activity.

102.   On December 5, 2022, Mr. Roundtree sent a letter to Greg Hayes, Raytheon's Chief Executive Officer, reporting the discrimination and retaliation.

103.   Mr. Hays responded that Raytheon does "not tolerate any form of discrimination."

104.   This is not true.

105.   Mr. Hayes stated to Mr. Roundtree, "We will begin a proper investigation immediately and take all appropriate action based on that investigation."

106.   Raytheon did not conduct a proper investigation or take all appropriate action based on the investigation.

107.   Mr. Roundtree continued to report and oppose the discrimination and retaliation.

108.   On February 28, 2023, Mr. Roundtree emailed HR to see if there was a hold on him that was preventing him from being promoted.

109.   Mr. Roundtree informed Ms. Schutte that he had applied for numerous positions, at least 11, that met his qualifications and that he only received responses stating that I was not selected.

110.    On February 14, 2023, Mr. Roundtree applied for the First Shift CNC Machinist position, Job No. 0159767, for which Raytheon rejected on March 31, 2023.

111.    On February 16, 2023, Mr. Roundtree applied for the Production Worker position, Job No. 01605196, for which Raytheon rejected on March 1, 2023.

112.    On February 26, 2023, Mr. Roundtree applied for the Quality Inspection Tech III position, Job No. 01607203, for which Raytheon rejected on February 28, 2023.

113.    On February 26, 2023, Mr. Roundtree applied for the Production Generalist HPT Blades position, Job No. 01604914, for which Raytheon rejected around February 28, 2023.

114.    On February 26, 2023, Mr. Roundtree applied for the Quality Inspection Tech III position, Job No. 01607203, for which Raytheon rejected on February 28, 2023.

115.    In February 2023, Mr. Roundtree applied for the First Shift Furnace Operator position, Job No. 01600560, for which Raytheon rejected on February 28, 2023.

116.    In February 2023, Mr. Roundtree applied for the First Shift Test Technician position, Job No. 01597938, for which Raytheon rejected on March 1, 2023.

117.    On March 1, 2023, Mr. Roundtree applied for the Value Stream Leader position, Job No. 01602423, for which Raytheon rejected on June 15, 2023.

118.    On May 16, 2023, Mr. Roundtree applied for the First Shift General Operations Assembly position, Job No. 01614184 331, for which Raytheon rejected on May 17, 2023.

119.    On May 17, 2023, Mr. Roundtree applied for the General Operations Assemble position, Job No. 01623895 331, for which Raytheon rejected on May 18, 2023.

120.    On May 31, 2023, Mr. Roundtree applied for the First Shift Level I NDT Inspector position, Job No. 01627970, for which Raytheon rejected on June 6, 2023.

121.    Upon information and belief, Raytheon gave each of those positions to a person less qualified than Mr. Roundtree and who did not file a race discrimination lawsuit or make those claims in response to discovery requests and most if not all were given to non-Black employees.

122.    This is race discrimination because even though Mr. Roundtree has 36 years of manufacturing experience, Raytheon refuses to acknowledge his experience, and gives the positions to similarly situated employees who are less qualified and not Black and have not reported discrimination.

123.    Raytheon is covering up its racism by saying that Mr. Roundtree does not meet the qualifications.

124.    This is not true.

125.    Not one Black machinist in the facility has been selected for a position outside of the building.

126.    Several non-Black employees have been selected for other positions to avoid the impending layoff.

127.    Mr. Roundtree continues to do an excellent job, apply for positions he is qualified for, and protest the discrimination orally and in writing.

128.    Raytheon continues to deny Mr. Roundtree equal pay or equal positions.

129.    Raytheon denied Mr. Roundtree the positions for which he had the skills, qualifications, and experience.

130.    Mr. James saw Steve Shardonofsky, one of Raytheon's lawyers and investigators, meet with Mr. James's manager, Jeff Walter, Chris Korde, and other

managers in October 2022, including around the same time Mr. Shardonofsky met with Mr. James and the other Plaintiffs about their claims of discrimination and retaliation.

131.    In addition to the inferences supplied by managers' conversations with attorneys for Raytheon and another manager who knew about the claims, a fact finder can reasonably infer that Raytheon's systems supplied all information to managers about the prospective applicant, including claims of discrimination or retaliation.

132.    Plaintiffs filed the lawsuit in November 2022.

133.    The lawsuit is protected activity.

134.    Several days later, Mr. Roundtree informed Mr. Korde, the plant manager, of the lawsuit.

135.    The hiring manager had actual knowledge of the lawsuit when he made his decision not to accept Mr. Roundtree for the new positions or promotions.

136.    On May 5, 2023, the Machinists responded to Raytheon's discovery requests by reporting discrimination and retaliation.

137.    Raytheon had corporate knowledge of the lawsuit and discovery responses when it made its decision not to accept Mr. James for the new positions or promotions.

**Ollie Dailey**

138.    Mr. Dailey has worked as a Production Specialist with Raytheon since 2017.

139.    Since that time, Raytheon has repeatedly hired Senior Production Specialists with less qualifications than Mr. Dailey and who are not Black.

140.    Raytheon paid these less qualified employees who were not Black more than Mr. Dailey.

141.    Raytheon required Mr. Dailey to train these less qualified employees.

142.    Each of these Senior Production Specialists is similarly situated to Mr. Dailey.

143.    Similarly situated Non-Black employees with less experience have been hired at Senior Production Specialists.

144.    Raytheon's pay scale ranged from $27-$35.

145.    Raytheon paid the Non-Black employees with less experience about $5 to $6 per hour more than Mr. Dailey.

146.    The identity of some of these comparators are David Rallin (Hawaiian or Non-Black), Tom Tang (Asian), around Stephen Galvan (Hispanic).

147.    Raytheon continues to pay each of these persons more than Mr. Dailey.

148.    Mr. Dailey has 45 years of Machinist experience.

149.    On February 25, 2020, Mr. Dailey reported to Dee Walton in HR that Raytheon had promoted two employees to senior positions who were not Black and had less seniority than him.

150.    Mr. Dailey complained that he was more qualified than these two employees and Raytheon required him to train them because he was more qualified.

151.    Raytheon refused to investigate or fix the discrimination.

152.    Mr. Dailey reported more at least three times in 2020 to his supervisors that White Supremacy literature was posted in the main Men's restroom.

153.    Mr. Dailey reported race discrimination to supervisors Mark Cooper and Brandon Vickery in 2020.

154.    Mr. Dailey reported that racist material referencing white power was written in the restroom, including QAnon stickers.

155.    Mr. Cooper removed QAnon stickers; however, in accordance with Raytheon's normal practice, Raytheon did not investigate the reports or take any further action.

156.    Instead, Raytheon swept the incidents under the rug.

157.    On August 24, 2021, Raytheon announced a new Value Stream Lead ("VSL") position, a promotion from a Production Specialist to a Senior Production Specialist for which Mr. Dailey met the qualifications.

158.    Mr. Dailey applied for the VSL position on August 29, 2021.

159.    Raytheon gave the position to a less qualified, non-Black individual, Son Nguyen, in September 2021.

160.    Upon information and belief, Mr. Nguyen had not recently engaged in protected activity.

161.    Mr. Nguyen was not familiar with the software program needed for the position.

162.    Jaime Hernandez, one of Mr. Dailey's supervisors, made the discriminatory and retaliatory decision not to promote Mr. Dailey.

163.    Raytheon should have promoted Mr. Dailey to the VSL position before hiring or promoting these persons to the position.

164.    Raytheon continued to refuse to promote Mr. Dailey to the Senior Production Specialist Position.

165.    Mr. Dailey reported the discrimination to Kevanna Fowler in HR on November 4, 2021.

166.    Mr. Dailey reported concerns about Raytheon's  selection process for the VSL position.

167.    Mr. Dailey reported that his education and experience showed he was more than qualified for the position.

168.    Mr. Dailey reported that the response by Mr. Hernandez, the hiring manager, to Mr. Dailey's question for the reason he was not hired included, "I don't like the way you present yourself."

169.    Mr. Dailey reported to HR that he was shocked and asked Mr. Hernandez, "What is the expectations of Raytheon as to how an African American male should present himself."

170.    Raytheon refused to investigate the discrimination.

171.    The failure to promote Mr. Dailey is an adverse employment action.

172.    Raytheon's refusal to investigate is a retaliatory failure to remediate because the uncorrected action of not promoting Mr. Daily would be of enough significance to qualify as an adverse action and the conduct would dissuade a reasonable worker from making or supporting a charge of discrimination.

173.    After Mr. Dailey reported discrimination, Raytheon began to transfer Mr. Dailey to different positions, working on different machines and with a different schedule.

174.    Raytheon's position for Mr. Dailey a Production Specialist in the Milling Department working on Mill Turn machines.

175.    In September 2022, Mr. Hernandez, moved Mr. Dailey from the Mill Turn machines to the Kitamura 500 machine, which is in a different department and requires different training.

176.    Mr. Hernandez also changed Mr. Dailey from an eight-hour shift to a twelve-hour shift, which caused a great disruption in his home life.

177.    Miguel Trevino trained Mr. Dailey on the Kitamura 500 machine for a week but did not want to train Mr. Dailey and stopped.

178.    A week later, Raytheon had Pancho Perez train Mr. Dailey on the Kitamura 500 machine.

179.    In early October 2022, Mr. Vickery, another one of Mr. Dailey's supervisors, transferred Mr. Dailey to the Kitamura 400 machine.

180.     Mr. Dailey reported  race discrimination again in a detailed statement given to Mr. Shardonofsky, Raytheon's counsel and investigator on October 24, 2022, when Mr. Shardonofsky interviewed Mr. Dailey and the other Machinist plaintiffs for multiple hours.

181.    Mr. Shardonofsky conducted a sham investigation.

182.    Mr. Dailey reported race discrimination to Raytheon's counsel again in November 2022.

183.    Raytheon refused to investigate the report of discrimination, refused to promote Mr. Dailey or fix the discrimination and retaliation.

184.    Raytheon continues to refuse to remedy the discrimination and retaliation, constituting further continuing retaliation.

185.    In January 2023, Mr. Vickery and Taylor Vanloo changed Mr. Dailey's shift from the twelve-hour shift back to the eight-hour shift.

186.    On February 15, 2023, Mr. Hernandez transferred Mr. Dailey from the Kitamura 400 machine to the Mori Seki Lathe machine.

187.    On February 17, 2023, Mr. Hernandez transferred Mr. Dailey back to the Kitamura machine.

188.    On February 27, 2023, Mr. Hernadez transferred Mr. Dailey back to the Mori Seki Lathe machine.

189.    Raytheon never allowed Mr. Dailey to get comfortable in his area with his machines.

190.    In March 2023, Raytheon allowed Jorge, another Production Specialist in the Milling Department who is similarly situated to Mr. Dailey, to work overtime but not Mr. Dailey.

191.    These are some of the examples of how Raytheon does not offer the same opportunities to African Americans as they do to non-African American employees and retaliation for protected activity.

192.    More evidence of Raytheon's discriminatory hiring practices are the comments made by Raytheon's hiring manager, Jaime Hernandez, about Mr. Dailey's personal characteristics.

193.    Mr. Hernandez told Mr. Dailey that he did not like how Mr. Dailey presented himself.

194.    The context in which the statement was made was racial.

195.    Mr. Dailey stated that Raytheon discriminated against him because he has been passed up for promotions within his department because Raytheon prefers to promote non-African American employees and place them in higher pay grades.

196.    In further discrimination and retaliation, Raytheon made Mr. Dailey train the less qualified non-African American employees.

197.    Mr. James saw Steve Shardonofsky, one of Raytheon's lawyers and investigators, meet with Mr. James's manager, Jeff Walter, Chris Korde, and other managers in October 2022, including  around the same time Mr. Shardonofsky met with Mr. James and the other Plaintiffs about their claims of discrimination and retaliation.

198.   In addition to the inferences supplied by managers' conversations with attorneys for Raytheon and another manager who knew about the claims, a fact finder can reasonably infer that Raytheon's systems supplied all information to managers about the prospective applicant, including claims of discrimination or retaliation.

199.   Plaintiffs filed the lawsuit in November 2022.

200.   The lawsuit is protected activity.

201.   Several days later, Mr. Roundtree informed Mr. Korde, the plant manager, of the lawsuit.

202.   The hiring manager had actual knowledge of the lawsuit when he made his decisions to make the retaliatory transfers of Mr. Dailey.

203.   On May 5, 2023, the Machinists responded to Raytheon's discovery requests by reporting discrimination and  retaliation.

204.   Raytheon had corporate knowledge of the lawsuit and discovery responses when it made its decisions to make the retaliatory transfers of Mr. Dailey.

**Gerry Lewis**

205.   Mr. Lewis started working for Raytheon as a production specialist in 2007.

206.   Raytheon eventually promoted Mr. Lewis to a supervisor.

207.    However, Raytheon pays Mr. Lewis less than similarly situated supervisors that are not Black, including Matt Cotter (White) and John Debeil, (White).

208.    Before Mr. Lewis was promoted to supervisor, an unqualified, non-Black employee was given the position.

209.    Mr. Lewis had more experience and qualifications than this non-Black employee.

210.    Mr. Lewis complained to Raytheon the ethics hotline about the discriminatory decision.

211.    Raytheon removed the supervisor from the position.

212.    Raytheon then created a requisition for the job.

213.    This was after Mr. Lewis complained to Raytheon's Ethics Department.

214.    Mr. Lewis applied about two to three years ago and got the job; however, making less money than his similarly situated peers.

215.    A White employee said he was confused how Mr. Lewis got the supervisor job.

216.    Mr. Lewis told him it was because he applied for it, had more experience, and actually had been doing the job for 14 years.

217.   Mr. Lewis asked my manager (Tucker Wang, White) why Mr. Lewis was not even close to the other managers around the plant regarding compensation.

218.   Mr. Wang simply told Mr. Lewis that there is a reason for that.

219.   Mr. Lewis did not tell Mr. Lewis the reason.

220.   He didn't have to.

221.   The reason was obvious: Mr. Lewis's race.

222.   All the other similarly situated supervisors that Mr. Lewis deals with every day are all White.

223.   Mr. Lewis is held to a different standard at work compared to White comparators.

224.   In April 2023, Mr. Lewis asked Mr. Wang for a raise.

225.   Mr. Wang responded, "That is probably not going to happen."

226.   Mr. Lewis brought it up again that White supervisors are making more than him.

227.   Mr. Wang did not say let's find out if you can get a raise.

228.   Mr. Wang would not even put in for him me to get a raise.

229.   Mr. Wang knew that there would be no point because Mr. Lewis is Black.

230.    Raytheon does not treat Black employees the same as non-Black employees.

**Antonio James**

231.    Mr. James has worked for Raytheon as a machinist since 2012.

232.    Mr. James applied for a Value Stream Leader position in 2020 after completing the machinist program.

233.    Raytheon did not give Mr. James a raise after he completed the program.

234.    However, the supervisor, Jeff Walton, gave White employees similarly situated to Mr. James raises.

235.    Mr. Walton gave Mr. James negative reviews to affect his eligibility for a raise.

236.    Raytheon chose not to select Mr. James as not selected for the Value Stream Leader position.

237.    Instead, Raytheon chose two similarly situated White and one Hispanic employees for the positions.

238.    Raytheon told Mr. James that he was not selected for the position because he had not been in the building long enough.

239.    However, the three employees who were selected started in the building after Mr. James.

240.    At that point, Mr. James had been with Raytheon for five years.

241.    The three non-Black employees had only been with Raytheon for couple of years.

242.    Raytheon created the Value Stream Program to hide its racism in selecting employees for raises.

243.    Knowing that the facility is being shut down, Mr. James has applied for five to seven machinist positions since January 2023.

244.    Mr. James applied for the First Shift Furnace Operator position in February 2023.

245.    Raytheon notified Mr. James that Raytheon did not select him for the First Shift Furnace Operator position on February 28, 2023.

246.    Mr. James does not remember the exact dates or names of the other five to seven machinist positions for which he applied.

247.    When Mr. James tried to access the information in about August, 2023, while he was still employed by Raytheon, he discovered that Raytheon removed him from access to the information.

248.   Raytheon has the records of the other specific times Mr. James applied for positions at Raytheon for which he was qualified and then was denied; however, Raytheon is withholding the information regarding these positions.

249.   Each time Raytheon notified Mr. James was not qualified.

250.   Raytheon's reason does not make sense.

251.   Mr. James has experience working for Raytheon since 2012.

252.   The only qualification Mr. James does not meet is the non-Black skin color requirement.

253.   Raytheon refused to promote Mr. James in retaliation for complaining about the race discrimination through the lawsuit.

254.   Mr. James applied internally through Raytheon's Global Talent Acquisition system.

255.   Mr. James has knowledge from past experience in applying through the system that his managers are contacted as part of Raytheon's procedures to make the decision on job acceptance.

256.   Mr. James saw Steve Shardonofsky, one of Raytheon's lawyers and investigators, meet with Mr. James's manager, Jeff Walter, Chris Korde, and other managers in October 2022, including  around the same time Mr. Shardonofsky met

with Mr. James and the other Plaintiffs about their claims of discrimination and retaliation.

257.    In addition to the inferences supplied by managers' conversations with attorneys for Raytheon and another manager who knew about the claims, a fact finder can reasonably infer that Raytheon's systems supplied all information to managers about the prospective applicant, including claims of discrimination or retaliation.

258.    Plaintiffs filed the lawsuit in November 2022.

259.    The lawsuit is protected activity.

260.    Several days later, Mr. Roundtree informed Mr. Korde, the plant manager, of the lawsuit.

261.    The hiring manager had actual knowledge of the lawsuit when he made his decision not to accept Mr. James for the new positions or promotions.

262.    On May 5, 2023, the Machinists responded to Raytheon's discovery requests by reporting discrimination and  retaliation.

263.    Raytheon had corporate knowledge of the lawsuit and discovery responses when it made its decision not to accept Mr. James for the new positions or promotions.

**Corey Polite**

264.    Mr. Polite has worked as a Senior Production Specialist for Raytheon since September 2007.

265.    In 2018, Mr. Polite applied for a machinist position and was interviewed by Scott Galloway, a supervisor.

266.    The application for the 2018 position was denied before November 2018.

267.    Mr. Galloway (White) told Mr. Polite that he would hire him.

268.    When Raytheon did not select Mr. Polite for the position, it told Mr. Polite that he was more valuable in his current position and that the current manager did not want Mr. Polite to go.

269.    Mr. Polite had just returned from medical leave and Mr. Galloway would avoid him.

270.    Another employee said that Jeff Walton, a White manager, would not release Mr. Polite.

271.    Mr. Polite's supervisor said that he would release Mr. Polite but could not because the manager, Jeff Walton, did not want him to do it.

272.    This happened because Mr. Polite is Black.

273.    Raytheon does not treat you the same as they treat non-Black employees.

274.    Mr. Polite has been in his current position for 16 years.

275.    Mr. Polite has tried to promote out multiple times.

276.    Mr. Polite applied for multiple positions, but the positions were not being offered to employees of color.

277.    Mr. Polite first started applying for positions after his fifth year of employment with Raytheon.

278.    Raytheon always hired an employee underneath Mr. Polite.

279.    These employees were not Black.

280.    Mr. Polite had more seniority than the non-Black employees chosen.

281.    Mr. Polite's manager, Mr. Walton, said that Mr. Polite would never get out of the department because Mr. Polite is "married" to the department.

282.    Raytheon does not follow its policies for posting positions.

283.    Instead, the positions are given to employees who the managers want.

284.    In 2020, Mr. Polite applied for four different positions and applied to be selected for the PR training class.

285.    PR is a supervisor position, now known as the Value Stream Leader (VSL) position.

286.  When the class started, no Black employees were selected.

287.  Instead, Raytheon selected White employees.

288.  Mr. Polite has an excellent employment record with Raytheon.

289.  Because Raytheon is racist, Mr. Polite has not been selected for anything in 16 years.

290.  In 2021, Raytheon turned down Mr. Polite for a PR position.

291.  Raytheon gave it to a White employee who trained.

292.  Mr. Polite had been working in the same PR position for two years before they placed the White employee in the position.

293.  Mr. Polite first applied for the PR position because in his employee review, Mr. Polite was asked if I would be interested in the position.

294.  When the time came, Raytheon told Mr. Polite that the White employee was more qualified.

295.  Rick Jennings (Black), Mr. Polite's supervisor selected the less qualified White employee who Mr. Polite had trained for the PR position.

296.  Mr. Jennings told Mr. Polite that he was told to "pick the White guy" by Rich Spritzer (White) and Kelly Courtney (Black).

297.  Raytheon said that the White employee had more seniority which is a false reason to cover up race discrimination.

298.    The White employee was selected out of a different department.

299.    Mr. Polite told his supervisor, Mr. Jennings, that he would not apply for any more positions since Raytheon was not being fair about the promotion.

300.    Mr. Polite told Mr. Jennings that Raytheon did not give the job to him because he is Black.

301.    Raytheon cannot use Mr. Polite's work ethic as an excuse to discriminate.

302.    The only remaining reason is race.

303.    Mr. Jennings confirmed that it is because I am Black.

304.    Mr. Polite has been performing the duties of the N95 position for the last 10 years.

305.    Mr. Polite has not received any higher compensation for it.

306.    Mr. Polite kept fighting for this position only to be told over and over again, maybe next year.

307.    Mr. Polite never complained about having to perform the N95 duties.

308.    Mr. Polite is on the first responder team, the safety team, and he is an employee trainer.

309.    Mr. Polite's good performance is documented.

310. To Raytheon, Mr. Polite is not worth being treated the same because of his skin color.

311. In February 2019, Mr. Polite requested a promotion to the N95 position/rating to his supervisor during his annual performance evaluation discussion.

312. Raytheon refused to promote Mr. Polite to the N95 position/rating in 2019, 2020, and most of 2021.

313. The N95 position is akin to a rating for an employee at Raytheon and allows an employee more pay.

314. There is no formal application process for the N95 status.

315. If your performance is high enough, Raytheon will promote you to N95 status.

316. Mr. Polite was the longest-tenured employee in the Powder Paint Department at the Lemmon Avenue facility.

317. Mr. Polite worked in the Powder Paint Department for 18 years, and he only received "far exceeds expectations" on his performance reviews from the ratings for those 18 years.

318.    Mr. Polite's managers, Jeff Walton and Johan Bower, chose to promote Danny Lillith (White), Vincente (Hispanic), and Jessie Jahank (White) to the N95 status but refused to promote Mr. Polite, even after requested by Mr. Polite.

319.    Mr. Polite was more qualified and had more seniority than Mr. Lillith, Vicente, and Mr. Jahank.

320.    Mr. Polite has given everything to Raytheon for the N95 promotion, only to be told, "You didn't make it," every year.

321.    Raytheon finally gave Mr. Polite the N95 designation on December 26, 2021.

322.    Raytheon discriminated against Plaintiffs based on wages, promotions, and hiring.

323.    Raytheon favors employees who are not African American in hiring, promotions, transfers, compensation, and work environment.

324.    Raytheon hires and promotes non-African American persons who are less qualified than African Americans seeking or available for the same position.

325.    Raytheon pays non-African American persons more than similarly situated African Americans.

326.    Raytheon does not strive to create an environment in which employees feel free to raise concerns and are confident that those concerns will be addressed.

327.   Raytheon promotes and tolerates retaliation in the workplace.

328.   Raytheon knows that its employees fear retaliation in the workplace for opposing or reporting workplace violations.

329.   Although foreseeable, Raytheon fails to prevent discrimination against Plaintiffs.

330.   Although foreseeable, Raytheon fails to prevent retaliation against Plaintiffs when they report discrimination.

331.   Raytheon relies on the fear of retaliation to cover up or promote discrimination and fear of retaliation.

332.   Raytheon refuses to conduct a reasonable investigation to substantiate the illegal conduct.

333.   Raytheon relies on sham investigations to cover up and promote discrimination and fear of retaliation.

334.   Raytheon seeks to find information that does not substantiate Plaintiffs' claims and ignores information that substantiates Plaintiffs' claims.

335.   Raytheon views all of the facts in an investigation in its favor rather than in a reasonably objective manner.

336.   Raytheon does not act in good faith in preventing discrimination or retaliation.

337.   Raytheon chooses not to adequately train managers on the signs to recognize discrimination.

338.   Raytheon chooses not to adequately train managers on the signs to recognize retaliation.

339.   Raytheon fails to monitor the workplace for signs, symptoms, and red flags of discrimination to determine if managers and employees are preventing discrimination.

340.   Raytheon fails to monitor the workplace for signs, symptoms, and red flags of retaliation to determine if managers and employees are preventing retaliation.

341.   Raytheon managers recognize discrimination if someone makes racist comments, although they tolerate it, but managers are not adequately trained to look for signs, symptoms, and red flags of discrimination absent racial comments.

342.   Raytheon chooses not to adequately train managers that employees or agents who discriminate are not going to admit to discriminating against employees or agents.

343.   Raytheon chose not to adequately train managers that retaliators are not going to admit to retaliating against employees.

344.   Raytheon chose not to adequately train managers that people are afraid to report discrimination and retaliation because the discrimination and retaliation will only get worse.

345.   Raytheon covers up discrimination and retaliation by conducting sham investigations.

346.   Raytheon does not choose people to investigate reports of discrimination and retaliation who are neutral.

347.   Raytheon chooses people to investigate complaints of discrimination and retaliation whose job is to defend Raytheon against claims of discrimination and retaliation.

348.   When employees report discrimination and retaliation, the investigators cover up the discrimination and retaliation by refusing to examine the evidence in an objective manner, refusing to interview all important witnesses, refusing to consider all important documents, and gaslighting the persons reporting the discrimination and retaliation.

**Discriminatory and Retaliatory Treatment of Plaintiffs**

349.   Raytheon treated Plaintiffs differently from similarly situated persons who are not Black.

350.   The Plaintiffs have been subjected to adverse actions, and disparate pay and promotion opportunities.

351.   The Plaintiffs can corroborate discriminatory facts of each other.

352.   Plaintiffs are persons of integrity, courage, and perseverance.

353.   Plaintiffs are level- headed and good workers.

354.   Plaintiffs are not complainers just to be complainers.

355.   Plaintiffs repeatedly reported bad treatment, and nothing changed.

356.   Raytheon did not investigate each report of discrimination.

357.   Raytheon when it investigates, it does not interview all important witnesses.

358.   To Plaintiffs' knowledge, Raytheon has never substantiated discrimination or retaliation after a complaint has been made.

359.   No matter what it finds, Raytheon always claims it's not discrimination or retaliation.

360.   Raytheon as a large company must have systems to prevent discrimination and retaliation.

361.   Raytheon must supervise and monitor to prevent discrimination and retaliation.

362.   HR must not just always side with Raytheon.

363.  Good, hard-working employees should be treated fairly.

364.  Raytheon must communicate the results of an investigation to the person reporting the problem.

365.  Raytheon must follow its own policies.

366.  The plaintiffs do not have to prove their case out of their own mouths alone.

367.  Raytheon must treat reports of discrimination or retaliation seriously.

368.  Raytheon must not assume that discrimination or retaliation is just in someone's head and not real.

369.  Other witnesses back up Plaintiff's reports of discrimination and retaliation.

370.  Many employees at the facility are being placed in other positions as the facility at which the Machinist Plaintiffs' work is being shut down.

371.  No Black employee has been placed in another position to save the employee's job as the facility is being shut down.

372.  Raytheon has surveillance cameras at its facilities.

373.  Raytheon does not allow employees to take pictures at the facility at which the Machinist Plaintiffs' work.

374.  Corporations must protect employees from unlawful termination.

375.    Corporations must prevent unlawful conduct even if managers think it's too hard.

376.    Corporations must prevent unlawful conduct even if it will make managers and other employees upset.

377.    HR and managers must be trained how to recognize discrimination and retaliation.

378.    HR and managers must be trained to look for signs, symptoms, and red flags of discrimination.

379.    HR and managers must be trained to look for racial comments.

380.    HR and managers must be trained to look for different treatment in pay.

381.    HR and managers must be trained to look for different treatment in promotions and transfers.

382.    HR and managers must be trained to look for different treatment in hiring.

383.    HR and managers must be trained to look for different treatment in discipline.

384.    HR and managers must be trained to look for different treatment in attitude.

385.    HR and managers must be trained to look for signs of a toxic work environment.

386.    HR and managers must be trained to stop a supervisor or co-worker from treating a person differently because of race.

387.    HR and managers must be trained to stop a supervisor or co-worker from retaliating.

388.    Raytheon is responsible for the proper training of HR and managers.

389.    Raytheon must honestly and accurately report discrimination to the government.

390.    Raytheon is responsible for supervising HR and managers.

391.    It is never okay to discriminate based on race.

392.    It is never okay to retaliate against someone making a good faith report of discrimination.

393.    Plaintiffs did not violate any policy at Raytheon.

394.    Raytheon does not have any documented complaints against Plaintiffs.

395.    Raytheon must follow its own policies.

396.    Raytheon must not ignore red flags of discrimination and retaliation.

**The Machinist Plaintiffs**

397.   The Machinist Plaintiffs observed and experienced the racism at Raytheon and repeatedly reported and opposed the discrimination.

398.   These Machinist Plaintiffs reported race discrimination and retaliation to Raytheon.

399.   When the Machinist Plaintiffs reported the discrimination and retaliation to Raytheon, Raytheon either ignored them or conducted sham investigations initially by HR and supervisors.

400.   Raytheon refuses to pay or promote or keep the Machinist Plaintiffs and the Accounting Plaintiffs on an equal basis as non-Black employees.

401.   Raytheon harasses Machinist Plaintiffs by engaging in conduct unwelcome to Plaintiffs based on race or protected activity.

402.   Raytheon's harassment is such that enduring offensive conduct becomes a condition of continued employment.

403.   Raytheon's conduct toward the Machinist Plaintiffs is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, offensive, or abusive.

404.   Raytheon's conduct is not just petty slights, annoyances, or isolated incidents, except for possibly a few extremely serious actions.

405.    Raytheon repeatedly and consistently treated and continues to treat the Machinist Plaintiffs as less than in the conduct described in detail in this complaint.

406.    The Machinist Plaintiffs work under conditions daily of being required to work for less pay than non-Black peers, experiencing repeated rejection, and living as "less than" every day.

407.    If several weeks is not enough, then several months should be enough.

408.    If several months is not enough, then several years should be enough.

**Demand and Lawsuit**

409.    On October 5, 2022, Plaintiffs' counsel sent a letter to Wes Kremer at Raytheon on behalf of the Machinist Plaintiffs.

410.    The letter reported the following on behalf of the Machinist Plaintiffs:

Based on our understanding of the facts, Raytheon is systematically violating laws against discrimination and retaliation. Among the discriminatory and retaliatory acts are the repeated use of racial comments, the display of a noose and white supremacist stickers, failure to promote, hiring and pay disparity, threats, and bullying. The racial comments include the N-word.

White individuals with less or no experience are hired at a higher pay rate than current Black employees with substantial experience and the Black employees are expected the new White employees. When Black employees report or oppose the discrimination, Raytheon retaliates. If an investigation is conducted it is a sham. Many time the complaints are not investigated.

Our clients are prepared to file EEOC charges under the Civil Rights Act of 1964, and a lawsuit under the Civil Rights Act of 1866 if the

matter is not resolved immediately. Please have legal counsel contact me as soon as possible to discuss a resolution of the matter.

411.    On October 6, 2022, Steven Greenspan, Corporate Vice President and Chief Litigation Counsel in Raytheon's Legal, Contracts & Compliance department, acknowledged receiving the letter and stated Raytheon had begun an investigation with Mr. Roundtree's report of discrimination and retaliation.

412.    Mr. Greenspan stated that the investigation would be conducted by Raytheon's corporate office team with the assistance of outside counsel.

413.    Raytheon stated that Dan Wenner, Raytheon's in-house counsel, would lead the investigation.

414.    The Machinist Plaintiffs agreed to meet with Mr. Wenner and Raytheon's outside attorneys; however, they feared a sham investigation and that Raytheon would be attempting to build a defense, control the narrative, use their words against them, delay the process, and ultimately cover up the discrimination and retaliation.

415.    Raytheon invited Plaintiffs' counsel to attend; however, Plaintiffs' counsel considered it inappropriate for an attorney who would be representing the Plaintiffs' at trial to become a key fact witness as to how Raytheon conducted the investigation.

416.    The Machinist Plaintiffs requested a firm date by which the investigation would be concluded with a resolution that ended and remedied the discrimination and retaliation.

417.    On November 2 and 3, 2022, Raytheon's inside counsel, Mr. Wenner, and outside counsel Mr. Shardonofsky and Lauren Parris Watts, met with the Machinist Plaintiffs about their Raytheon's personal discrimination and retaliation against them, and "to discuss all the systematic racism issues that have been existing at Raytheon for the past 60 plus years."

418.    The attorneys investigating the reports of discrimination and retaliation acted as if they were independent fact finders.

419.    The Machinist Plaintiffs suspected that this was not the case.

420.    Nevertheless, the Machinist Plaintiffs consented to meet with the attorney investigators to avoid being accused of, and fired for, insubordination.

421.    The Machinist Plaintiffs provided to the attorney investigators the same information about their personal information as described in this lawsuit complaint.

422.    Raytheon characterized the information from the Machinist Plaintiffs as "about 60 allegations of discrimination during out interviews with them."

423.   Raytheon focused only on a few facts that it believed the Machinist Plaintiffs could not corroborate with other witnesses.

424.   Raytheon's response was not to confirm all the evidence it could confirm, but to identify the evidence presented by the Machinist Plaintiffs that it thought was the weakest.

425.   The attorney investigators complained that the conduct reported by the Machinist Plaintiffs' went back more than four years.

426.   The Machinist Plaintiffs knew that damages for conduct more than four years could be remedied but were cooperating in providing all information and context.

427.   Raytheon knows that systematic conduct beginning more than four years earlier is relevant and necessary to determine the root cause.

428.   Raytheon knows that race discrimination must be viewed in context of history of the treatment of African Americans in the United States in which they were enslaved; lynched; redlined to their side of town; segregated in schools, transportation, restaurants, hotels, restrooms, and water fountains; kept out of major universities, barred from voting, and denied the best jobs.

429.   Raytheon claimed that it did not understand the discrimination or retaliation against the Machinist Plaintiffs' complaints.

430.   The Machinist Plaintiffs knew that it would be difficult to convince persons who were being paid not to understand.

431.   The discriminatory treatment, especially the difference in pay and position, was easily verifiable.

432.   The Machinist Plaintiffs' fears that Raytheon would again conduct a sham investigation intended not to find the truth of any discrimination or retaliation, even the easily verifiable pay and position disparity, but would be an effort to cover up the discrimination and retaliation were realized.

433.   Raytheon's response was to gaslight the Machinist Plaintiffs and feign confusion.

434.   Raytheon is not confused or ignorant as to the details of the allegations made in this lawsuit, even before the lawsuit was filed.

435.   Four weeks after the attorney investigators interviewed the Machinist Plaintiffs, Raytheon had not concluded its investigation.

436.   Raytheon would not confirm the pay and position disparity, or confirmation of racial comments or the noose.

437.   Raytheon would not confirm or acknowledge any discrimination or retaliation.

438.    The Machinist Plaintiffs gave Raytheon until November 18, 2022, to conclude the investigation and remedy the situation to avoid filing an EEOC charge or lawsuit.

439.    Raytheon continued to delay and allow the discrimination and retaliation to continue without concluding its investigation.

440.    The Machinist Plaintiffs filed this lawsuit on November 30, 2022.

441.    Raytheon stopped all signs of investigation.

442.    Raytheon has not communicated any findings of the investigation.

443.    Raytheon has not remedied the discrimination or retaliation.

444.    Raytheon continues the retaliation because of the lawsuit.

**THE ACCOUNTANT PLAINTIFFS**

445.    Raytheon identified the Accountant Plaintiffs as temporary accounting support employees who would be given the opportunity to become permanent employees.

446.    Raytheon denied the Accounting Plaintiffs the promised opportunity to become permanent employees because of their race or for opposing discrimination.

447.    In September 2021, Raytheon said it need about 20 temporary "Contract" employees.

448.    Raytheon characterized the position as Accounts Payable Support.

449.    Raytheon interviewed about 20 people for the positions, including the Accounting Plaintiffs.

450.    Of the persons interviewed, only about 15 passed the background check and were hired in September 2021.

451.    The employees were known at the company as RayTechs.

452.    Raytheon has a RayTech position for temporary employees who are not allowed to have the same benefits as "permanent" employees.

453.    Raytheon then hired an additional five employees for the same position in January 2022.

454.    Raytheon's hiring manager was Juan Franco, from Puerto Rico.

455.    Raytheon promoted Mr. Franco to a supervisor permanent employee position.

456.    The accounts payable support employees hired worked remotely.

457.    However, they reported to Raytheon's Richardson, Texas office.

458.    Mike Sheveland was the supervisor of the accounting RayTechs.

459.    Mr. Sheveland reported to Mr. Franco.

460.    Raytheon said that the temporary assignment was for one year, from September 2021 to September 2022.

461.    In July 2022, Mr. Franco had a meeting with all of the accounting RayTechs, which had dwindled to about 16 employees at that time because some had quit.

462.    Mr. Franco said that all of the remaining RayTechs, including the Accounting Plaintiffs would be offered permanent employee position, as long as the person had good attendance, good work habits, and got along with staff.

463.    Each of the Accounting Plaintiffs met these qualifications.

464.    In September 2022, Mr. Franco held another meeting and said that Raytheon required each application and to be interviewed.

465.    Mr. Franco said that the reason for the interview was so that there would be no favoritism.

466.    The reason did not make sense because if Raytheon kept with the original qualifications, there would not be any favoritism.

467.    Mr. Franco said that the permanent positions would be the same as the temporary positions, except that the employees would be permanent and eligible for benefits.

468.    Each of the Accounting Plaintiffs applied and interviewed for the permanent positions.

469.   Of the persons who applied, only about nine were accepted as permanent employees.

470.   Raytheon refused to accept any of the Black temporary employees, including the Accounting Plaintiffs.

471.   Raytheon did not give a reason.

472.   Raytheon terminated each of the Accounting Plaintiff, except for Ms. Davis.

473.   Raytheon did not accept Mr. Davis for the permanent position.

474.   Raytheon kept Ms. Davis in the temporary position, as a RayTech, because her responsibilities were different and Raytheon did not have a person trained to perform them.

475.   Raytheon required Ms. Davis to train her replacement.

**Heather Davis**

476.   Ms. Davis was hired on September 20, 2021.

477.   She experienced race discrimination almost immediately.

478.   The full list of employees who discriminated against her is known only by Raytheon at this time.

479.   Ms. Davis knows she was discriminated against by upper management and human resource professionals.

480.   Ms. Davis can see that it is systemic at Raytheon.

481.   Michael Sheveland, Ms. Davis's supervisor, originally intended to terminate Ms. Davis on December 31, 2022; however, on December 20, 2022, Mr. Sheveland asked Ms. Davis to stay until the end of January and did not provide Ms. Davis a scheduled termination date.

482.   Ms. Davis agreed.

483.   Ms. Davis reported to Raytheon its race discrimination, retaliation, and hostile work environment multiple times, both orally and in writing, to supervisors and to HR.

484.   She cannot remember every specific date and time she reported the discrimination, hostile work environment, and retaliation because there are too many.

485.   Ms. Davis does remember that reported discrimination on January 16, 2023, to Mr. Franco.

486.   Ms. Davis reported to Mr. Franco that all of the Black accounting employees were excluded from being made permanent employees.

487.   Ms. Davis reported that the decision was blatant discrimination.

488.   On January 16, 2023, Ms. Davis also reported the race discrimination to Whitney Rice-Richardson, an HR representative for Raytheon.

489. Raytheon designated Rachel Slifka, another HR representative, to meet with Ms. Davis about the discrimination.

490. Ms. Davis met with Ms. Slifka on January 17, 2023.

491. Ms. Davis explained to Ms. Slifka that seven qualified Black RayTech employees including herself were blatantly discriminated against because of race, by being intentionally excluded during the hiring of permanent employees.

492. Ms. Davis reported to Ms. Slifka that Raytheon instead hired less qualified persons as the permanent employees who were not Black.

493. On January 19, 2023, Mr. Franco (Accounting Manager) and Mr. Sheveland (Ms. Davis's Supervisor) decided not to extend Ms. Davis's employment a second time and scheduled a termination date for January 31, 2023.

494. Raytheon did not schedule Ms. Davis's termination date until after she reported race discrimination to Raytheon.

495. Ms. Slifka indicated that the investigation could not be completed within the two-week period.

496. Ms. Davis confirmed to Ms. Slifka that she was not resigning.

497. Raytheon failed to act promptly in investigating and remedying the discrimination.

498.    Raytheon's refusal to investigate timely is a retaliatory failure to remediate because termination is an adverse action and the uncorrected action of preventing the termination of employment would be of enough significance to qualify as an adverse action and the conduct would dissuade a reasonable worker from making or supporting a charge of discrimination.

499.    Ms. Davis met with Mila West, another HR representative, on January 23, 2023.

500.    Ms. West instructed Ms. Davis not to retaliate against anyone, which she said including asking any witnesses if they were involved in the investigation.

501.    The instruction was Raytheon's way of intimidating Ms. Davis, keeping her from conducting her own investigation, and knowing whether Raytheon's investigation was a sham.

502.    Raytheon was retaliating against Ms. Davis yet instructed Ms. Davis not to retaliate after learning of her termination.

503.    Ms. Davis had not taken any retaliatory action and would not take any retaliatory action.

504.    Raytheon perceived Ms. Davis's additional complaint of discrimination made after learning about her termination as a retaliatory act.

505.    Ms. Davis's complaint was not retaliatory; it was protected activity.

506.   Raytheon's characterization of the protected activity as retaliatory is evidence of Raytheon's retaliation for Ms. Davis's protected activity.

507.   Ms. Davis informed Ms. West about the discrimination against all of the Black RayTechs.

508.   Ms. Davis informed Ms. West that Mr. Franco did not give her a reason for not becoming a permanent employee.

509.   Ms. Davis informed Ms. West that Mr. Franco instructed Ms. Davis to train her replacement.

510.   Ms. Davis informed Ms. West that her replacement was not Black and was far less qualified than Ms. Davis.

511.   Ms. Miles asked, "How did you find out that Raytheon hired the approximately nine less qualified non-Black employees.

512.   Ms. Davis responded that the Non-Black employees told her that they were hired as permanent employees.

513.   Ms. Miles asked Ms. Davis what she wanted to happen, the results she was seeking.

514.   Ms. Davis replied that she was hoping to be given the same equal employment opportunities the Non-Black employees.

515.    Ms. Davis reported in that meeting the discrimination against her and other Black employees.

516.    Raytheon recognized Ms. Davis's contributions by giving her a Spot Award for Accountability.

517.    Raytheon recognized Ms. Davis's contributions by giving her a Spot Award for Collaboration.

518.    Ms. Davis has a Bachelor's degree, a Master's in Business Administration, and an Associates Paralegal Degree.

519.    Ms. Davis's education far exceeds her replacement who is not Black and did not engage in protected activity.

520.    Ms. Davis's experience far exceeds her replacement who is not Black and did not engage in protected activity.

521.    Raytheon did not report back on any investigation of Ms. Davis's complaint.

522.    Raytheon has not rehired Ms. Davis or any of the other Accountant Plaintiffs.

523.    Raytheon engaged in a retaliatory failure-to-remediate which is actionable because failure to prevent termination is actionable.

**Latoya Stuart, Silvia Matthews, Marian Payne, and Billy Kelly**

524.   Ms. Stuart, Ms. Matthews, Ms. Payne, and Mr. Kelly were each replaced by persons who were not Black and less qualified than them.

525.   Raytheon has not articulated a reason for their termination.

526.   In continuing rather than eliminating retaliation, Plaintiffs became the persons being investigated rather than the persons or conduct being complained about.

527.   Raytheon managers, HR personnel, and investigators ignore the signs of discrimination and retaliation and do not respond to prevent the discrimination and retaliation.

**Policies Do Not Enforce Themselves**

528.   Raytheon has written polices created for the purpose of following laws against discrimination and retaliation.

529.   Raytheon knows that the written polices do not enforce themselves.

530.   Raytheon' policies promised to protect Plaintiffs from discrimination and retaliation.

531.   Raytheon violated its own policies by discriminating and retaliating against Plaintiffs.

532.    Raytheon breached its promise to protect Plaintiffs from discrimination and retaliation.

533.    While this complaint provides sufficient detail to give notice of plausible claims of discrimination and retaliation, it does not contain all of the facts that may be presented at trial.

## THE FACT FINDER'S CHOICE

534.    The factfinder must make the choice and decide whether:

a.    the Plaintiffs telling the not telling the truth;

b.    the Plaintiffs are just basing their claims on beliefs, feelings, or thoughts;

c.    the Plaintiffs are merely speculation;

d.    Raytheon is telling the truth;

e.    Raytheon is acting in good faith;

f.    Raytheon has witnesses to support its defense;

g.    Raytheon has documents to support its defense;

h.    the Plaintiffs are believable;

i.    the Plaintiffs have other witnesses to support their claims;

j.    the Plaintiffs have documents to support their claims;

k.    Raytheon is not telling the truth;

l.    Raytheon knows that it discriminates and retaliates; or

m.    Raytheon is covering up the discrimination and retaliation.

## CAUSES OF ACTION

**Violation of the Civil Rights Act of 1866**

535.    Plaintiffs' claims for recovery under the Civil Rights Act of 1866 is based upon 42 U.S.C. § 1981, which provides that all persons within the United States shall have the same right to make and enforce contracts and to the full and equal benefit of all laws as is enjoyed by white citizens.

536.    This law entitles a person of color to equal opportunity and treatment in employment or other contractual relationships.

537.    The Civil Rights Act of 1866 is a centerpiece legislation in our country, founded upon the self-evident truth that all of us are created equal and endowed by their maker with certain inalienable rights, among them life, liberty, and the pursuit of happiness.

538.    Making a living is foundational to the pursuit of happiness in America.

539.    As recognized in our civil war over this principle, our country is dedicated to the proposition that all of us are created equal.

540.    The Civil Rights Act of 1866 was passed to give effect to the Thirteenth Amendment.

541.    The Civil Rights Act of 1866 became the blueprint for the Fourteenth Amendment.

542.    In our time, Martin Luther King, Jr. dreamed that one day our country would rise up and live out the meaning of its creed, that all of us are created equal.

543.    The Civil Rights Act of 1866 is the shining star that reflects the ideal of our country at its core.

544.    Our creed is not just embodied in a declaration, a speech, or a sermon, but in law and commerce where it matters, through the Civil Rights Act of 1866 by those with the courage to enforce it.

545.    The statue is enforced by those who are not afraid to upset the status quo, to stop the perpetual system of discrimination and retaliation, of unfairness and injustice.

546.    Under the Civil Rights Act of 1866, when an employer or contractor acts adversely against a person of color because of that person's race, the law has been violated and the person of color may file a suit and recover damages.

547.    A person is also entitled to file suit and recover damages under the Civil Rights Act of 1866 for retaliation for opposing or reporting violations of the Civil Rights Act of 1866, or for participating in an investigation of a violation of the Civil Rights Act of 1866.

548.  The Machinist Plaintiffs belong to a protected group and were subjected to unwelcome harassment based on their race.

549.  Raytheon knew or should have known of the harassment but took no prompt remedial action.

550.  The Machinist Plaintiffs were subjected to ridicule or insult, or other improper conduct based on their race.

551.  The harassment was obnoxious and shocking to the conscience of the ordinary person.

552.  The harassment was severe and pervasive, interfering with the terms and conditions of their employment or contractual relationship with Raytheon.

553.  The harassment and termination were sufficiently severe or pervasive to alter the conditions of the Machinist Plaintiffs' contractual relationship with Raytheon.

554.  The harassment was objectively and subjectively offensive.

555.  The disparaging racial treatment or other improper conduct was unwelcome and undesirable or offensive to Plaintiffs.

556.  The harassment of the Machinist Plaintiffs altered a term, condition, or privilege of their contractual relationship with Raytheon.

557.    A reasonable person would find that the harassment created and was abusive working environment.

558.    Employees or agents of Raytheon participated in the harassment of the Machinist Plaintiffs.

559.    Raytheon knew or should have known of the harassment and failed to take prompt, remedial action to eliminate the harassment.

560.    Raytheon has a pattern and practice of discriminating based on race and retaliating against those who oppose or report discrimination.

561.    Plaintiffs opposed Raytheon denying persons the "right to make" contracts and denying the same "security of persons and property as is enjoyed by white citizens" in the United States as required by federal law. *See* 42 U.S.C. § 1981.

562.    Raytheon treated Plaintiffs adversely after they opposed and reported unlawful discrimination.

563.    Raytheon engaged in material adverse actions against Plaintiffs, that might well dissuade a reasonable person from opposing or reporting the discrimination had they known they would face the adverse actions.

564.    The harassment of the Machinist Plaintiffs from Raytheon materially altered their contractual relationship, as well.

565.    The termination of the contractual relationship was not only discriminatory, but it was also retaliatory.

566.    Raytheon violated the federal statute by intentionally discriminating and retaliating against Plaintiffs; and, as a direct result of the discrimination and retaliation caused damages to Plaintiffs.

567.    The liability can be either actual or constructive under the *McDonnell Douglas* framework.

568.    Raytheon knew or should have known that its White employees were discriminating against African Americans and taken corrective action to prevent the discrimination within its control.

569.    Raytheon did not take the steps necessary to prevent the harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees or agents of their right to raise and how to raise the issue of harassment, and developing methods to sensitize all concerned.

**Compensatory and Equitable Relief**

570.    Plaintiffs sustained damages, including lost wages and benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life, and other nonpecuniary losses for which they are entitled to recovery under their causes of action.

571.    Plaintiffs are also entitled to declaratory relief that a violation has occurred.

572.    Plaintiffs are also entitled to equitable relief in the form of reinstatement and an injunction against future discrimination or retaliation.

**Attorneys' Fees**

573.    Plaintiffs are also entitled to attorneys' fees, interest, and costs of court for services rendered in this cause, including trials and appeals.

**Exemplary Damages**

574.    Plaintiffs are also entitled to receive punitive damages because Raytheon engaged in a discriminatory or retaliatory practice or in discriminatory or retaliatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

## JURY DEMAND

575.    Plaintiffs request a trial by jury to the extent allowed by law.

WHEREFORE, Plaintiffs requests that Defendant Raytheon answer and that on final trial, Plaintiffs have judgment against Defendants for compensatory, declaratory and equitable relief, and exemplary damages, attorneys' and expert fees,

costs of suit, and interest as provided by law, and any further relief to which they may be entitled.

Respectfully submitted,

             */s/ Brian P. Sanford*
              Brian P. Sanford
              Texas Bar No. 17630700
              bsanford@sanfordfirm.com
              Elizbeth "BB" Sanford
              Texas Bar No. 24100618
              esanford@sanfordfirm.com

            **THE SANFORD FIRM**
            1910 Pacific Ave., Suite 15400
            Dallas, TX 75201
            Ph:  (214) 717-6653
            Fax: (214) 919-0113

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2024, I electronically served the foregoing document on all counsel of record via the Court's electronic filing system.

             */s/ Brian P. Sanford*