IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HEATHER DAVIS, LATOYA STUART, SYLVIA MATTHEWS,  MARIAN PAYNE, and BILLY KELLY, | § § § | |
| | § | Civil Action 3:22-cv-2675 |
| *Plaintiffs*, | § § | |
| vs. | § § | **JURY DEMANDED** |
| RAYTHEON TECHNOLGIES CORP., | § § § | |
| *Defendant*. | § | |

## PLAINTIFFS' SIXTH AMENDED COMPLAINT AND JURY DEMAND

TO THE HONORABLE BARBARA M. G. LYNN:

Plaintiffs Heather Davis, Latoya Stuart, Silvia Matthews, Marian Payne, and Billy Kelly presents their Complaint for unlawful discrimination in violation of  the Civil Rights Act of 1866, 42 U.S.C. § 1981.

### PARTIES

1.      Heather Davis is a citizen and resident of the United States, residing Denton County, Texas.

2.      Latoya Stuart is a citizen and resident of the United States, residing Dallas County, Texas.

*Plaintiffs' Sixth Amended Complaint and Jury Demand*                    *Page 1*

3.    Sylvia Matthews is a citizen and resident of the United States, residing Dallas County, Texas.

4.    Marian Payne is a citizen and resident of the United States, residing Dallas County, Texas.

5.    Billy Kelly is a citizen and resident of the United States, residing Dallas County, Texas.

6.    Each of the Plaintiffs are Black or African American.

7.    Raytheon Technologies Corporation is a foreign corporation and has appeared in this case.

8.    Raytheon employed Ms. Davis, Ms. Stuart, Ms. Matthews, Ms. Payne, and Mr. Kelly as accountants, designating them as temporary employees, along with similarly situated employees who are not Black (the "Accountants").

9.    Raytheon terminated the Accountants but did not terminate similarly situated employees who were not Black, changing their status from temporary to permanent employees.

10.    Raytheon terminated Ms. Davis later than the other Accountants, after she complained of discrimination.

## JURISDICTION AND VENUE

11.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331.

12.     This is a suit authorized and instituted pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981; and declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     Venue of this Court is pursuant to 28 U.S.C. § 1391(b), the judicial district in which a substantial part of the events giving rise to this claim occurred.

## BACKGROUND

**Foreseeability of the Problem**

14.     Discrimination and retaliation are foreseeable because businesses know that discrimination and retaliation are prevalent in the United States.

### The Purpose of the Law

15.     Foreseeability is important because the law is meant to be preventative.

16.     The federal anti-discrimination laws' primary objectives are prophylactic, chiefly aimed not to provide redress but to avoid harm.

17.     Prevention is the best tool to eliminate discrimination and retaliation in the workplace.

18.     Employers must take appropriate steps to prevent and correct discrimination and retaliation, including unlawful harassment.

19.     Corporations may be liable for punitive damages who do not make good-faith efforts to prevent discrimination in the workplace to accomplish the objective of motivating employers to detect and deter discrimination violations.

20.     The right to expect that corporations hire managers and human resources (HR) representatives qualified to recognize and prevent discrimination and retaliation is essential to our community.

21.     The right to expect that corporations will adequately train managers and HR representatives to recognize and prevent discrimination and retaliation is essential to our community.

22.     The right to expect that corporations will supervise managers and HR representatives to recognize and prevent discrimination and retaliation is essential to our community.

23.     The right to expect that corporations will not discriminate in pay, promotion, transfer, discipline, work environment, or termination of employment is essential to our community.

24.    The right to expect that corporations will not retaliate against persons who report, in good faith, signs or red flags of discrimination or retaliation is essential to our community.

**Raytheon Is a Global Corporation**

25.    Raytheon is a global corporation providing military products and services to countries around the world, such as Saudi Arabia, Australia, the United Kingdom, Poland, and many other countries, not the least of which is the United States.

26.    Although Raytheon is a defense contractor for many countries, it is independent and flies its own flag.

27.    Raytheon knows that discrimination and retaliation are foreseeable as potential problems in its work and business place.

28.    Raytheon intentionally discriminates against Black employees.

29.    Raytheon's EEO-1 reports show the disparity.

**Raytheon's Serious System Failure**

30.    Raytheon has a system, scheme, or plan of discriminating against persons based on race and retaliating against persons when they oppose or report violations.

31.    Raytheon fails to follow its written policies prohibiting discrimination and retaliation laws.

32.    Raytheon hires managers and HR personnel who are not qualified to recognize and prevent discrimination and retaliation.

33.    Raytheon fails to adequately train its managers and HR personnel to recognize and prevent discrimination and retaliation.

34.    Raytheon fails to supervise its managers and HR personnel to ensure that they recognize and prevent discrimination and retaliation laws.

35.    Raytheon fails to monitor the workplace for signs, symptoms, and red flags of discrimination and retaliation.

**Consequences of Failure to Enforce**

36.    The result is that Raytheon treats employees and agents differently because of their race and then disciplines and terminates the employees and agents after the employees and agents report concerns of violations.

37.    Raytheon has a contractual employment relationship with Plaintiffs.

38.    The term or length of the contractual relationship was or is terminable at the will of either Raytheon or Plaintiffs, except that Raytheon cannot terminate the relationship for an illegal purpose, such as a violation of the Civil Rights Act of 1866.

39.    Raytheon discriminated against the Plaintiffs because of their race.

40.    When some of the Plaintiffs reported and opposed discrimination, Raytheon retaliated against them.

41.    The Civil Rights Act of 1866 is one of the most important laws in our country, obtained at the cost of a Civil War.

42.    Laws such as the Civil Rights Act of 1866 often are not enforced unless persons like the Plaintiffs have the courage to file lawsuits to enforce the law.

43.    Congress intended to empower individuals to act as private attorneys general in enforcing discrimination and retaliation laws.

44.    Plaintiffs are acting as private attorneys general in this case to enforce the law and aid in effectuating important congressional and public policies of the highest priority.

45.    Raytheon has a pattern or practice of discrimination against a group of Black or African American employees.

46.    Raytheon has a pattern or practice of retaliation against persons who oppose race discrimination.

47.    Raytheon engages in discrimination and retaliation against a group of African American persons.

48.    Raytheon's discriminatory and retaliatory actions are its regular practice, rather than an isolated instance.

49.    Raytheon has a policy of discriminating and retaliating.

50.    Raytheon favors employees who are not African American in hiring, promotions, transfers, compensation, and work environment.

51.    Raytheon hires and promotes non-African American persons who are less qualified than African Americans seeking or available for the same position.

52.    Raytheon does not strive to create an environment in which employees feel free to raise concerns and are confident that those concerns will be addressed.

53.    Raytheon promotes and tolerates retaliation in the workplace.

54.    Raytheon knows that its employees fear retaliation in the workplace for opposing or reporting workplace violations.

55.    Although foreseeable, Raytheon fails to prevent discrimination against Plaintiffs.

56.    Although foreseeable, Raytheon fails to prevent retaliation against Ms. Davis when she reported discrimination.

57.    Raytheon relies on the fear of retaliation to cover up or promote discrimination and fear of retaliation.

58.    Raytheon refuses to conduct a reasonable investigation to substantiate the illegal conduct.

59.    Raytheon relies on sham investigations to cover up and promote discrimination and fear of retaliation.

60.    Raytheon seeks to find information that does not substantiate Plaintiffs' claims and ignores information that substantiates Plaintiffs' claims.

61.    Raytheon views all of the facts in an investigation in its favor rather than in a reasonably objective manner.

62.    Raytheon does not act in good faith in preventing discrimination or retaliation.

63.    Raytheon chooses not to adequately train managers on the signs to recognize discrimination.

64.    Raytheon chooses not to adequately train managers on the signs to recognize retaliation.

65.    Raytheon fails to monitor the workplace for signs, symptoms, and red flags of discrimination to determine if managers and employees are preventing discrimination.

66.    Raytheon fails to monitor the workplace for signs, symptoms, and red flags of retaliation to determine if managers and employees are preventing retaliation.

67.    Raytheon managers recognize discrimination if someone makes racist comments, although they tolerate it, but managers are not adequately trained to look for signs, symptoms, and red flags of discrimination absent racial comments.

68.    Raytheon chooses not to adequately train managers that employees or agents who discriminate are not going to admit to discriminating against employees or agents.

69.    Raytheon chose not to adequately train managers that retaliators are not going to admit to retaliating against employees.

70.    Raytheon chose not to adequately train managers that people are afraid to report discrimination and retaliation because the discrimination and retaliation will only get worse.

71.    Raytheon covers up discrimination and retaliation by conducting sham investigations.

72.    Raytheon does not choose people to investigate reports of discrimination and retaliation who are neutral.

73.    Raytheon chooses people to investigate complaints of discrimination whose job is to defend Raytheon against claims of discrimination.

74.    When employees report discrimination, the investigators cover up the discrimination by refusing to examine the evidence in an objective manner, refusing to interview all important witnesses, refusing to consider all important documents, and gaslighting the persons reporting the discrimination and retaliation.

**Discriminatory and Retaliatory Treatment of Plaintiffs**

75.    Raytheon treated Plaintiffs differently from similarly situated persons who are not Black.

76.    The Plaintiffs have been subjected to adverse actions.

77.    The Plaintiffs can corroborate discriminatory facts of each other.

78.    Plaintiffs are persons of integrity, courage, and perseverance.

79.    Plaintiffs are level- headed and good workers.

80.    Raytheon when it investigates, it does not interview all important witnesses.

81.    To Plaintiffs' knowledge, Raytheon has never substantiated discrimination or retaliation after a complaint has been made.

82.    No matter what it finds, Raytheon always claims it's not discrimination or retaliation.

83.     Raytheon as a large company must have systems to prevent discrimination and retaliation.

84.     Raytheon must supervise and monitor to prevent discrimination and retaliation.

85.     HR must not just always side with Raytheon.

86.     Good, hard-working employees should be treated fairly.

87.     Raytheon must communicate the results of an investigation to the person reporting the problem.

88.     Raytheon must follow its own policies.

89.     The plaintiffs do not have to prove their case out of their own mouths alone.

90.     Raytheon must treat reports of discrimination or retaliation seriously.

91.     Raytheon must not assume that discrimination or retaliation is just in someone's head and not real.

92.     Other witnesses back up Plaintiff's reports of discrimination and retaliation.

93.     Corporations must protect employees from unlawful termination.

94.     Corporations must prevent unlawful conduct even if managers think it's too hard.

95.    Corporations must prevent unlawful conduct even if it will make managers and other employees upset.

96.    HR and managers must be trained how to recognize discrimination and retaliation.

97.    HR and managers must be trained to look for signs, symptoms, and red flags of discrimination.

98.    HR and managers must be trained to look for racial comments.

99.    HR and managers must be trained to look for different treatment in pay.

100.    HR and managers must be trained to look for different treatment in promotions and transfers.

101.    HR and managers must be trained to look for different treatment in hiring.

102.    HR and managers must be trained to look for different treatment in discipline.

103.    HR and managers must be trained to look for different treatment in attitude.

104.    HR and managers must be trained to look for signs of a toxic work environment.

105.   HR and managers must be trained to stop a supervisor or co-worker from treating a person differently because of race.

106.   HR and managers must be trained to stop a supervisor or co-worker from retaliating.

107.   Raytheon is responsible for the proper training of HR and managers.

108.   Raytheon must honestly and accurately report discrimination to the government.

109.   Raytheon is responsible for supervising HR and managers.

110.   It is never okay to discriminate based on race.

111.   It is never okay to retaliate against someone making a good faith report of discrimination.

112.   Plaintiffs did not violate any policy at Raytheon.

113.   Raytheon does not have any documented complaints against Plaintiffs.

114.   Raytheon must follow its own policies.

115.   Raytheon must not ignore red flags of discrimination and retaliation.

116.   Raytheon knows that systematic conduct beginning more than four years earlier is relevant and necessary to determine the root cause.

117.   Raytheon knows that race discrimination must be viewed in context of history of the treatment of African Americans in the United States in which they

were enslaved; lynched; redlined to their side of town; segregated in schools, transportation, restaurants, hotels, restrooms, and water fountains; kept out of major universities, barred from voting, and denied the best jobs.

118.    The discriminatory treatment was easily verifiable.

119.    Raytheon identified the Accountant Plaintiffs as temporary accounting support employees who would be given the opportunity to become permanent employees.

120.    Raytheon denied the Accounting Plaintiffs the promised opportunity to become permanent employees because of their race or for opposing discrimination.

121.    In September 2021, Raytheon said it need about 20 temporary "Contract" employees.

122.    Raytheon characterized the position as Accounts Payable Support.

123.    Raytheon interviewed about 20 people for the positions, including the Accounting Plaintiffs.

124.    Of the persons interviewed, only about 15 passed the background check and were hired in September 2021.

125.    The employees were known at the company as RayTechs.

126.    Raytheon has a RayTech position for temporary employees who are not allowed to have the same benefits as "permanent" employees.

*Plaintiffs' Sixth Amended Complaint and Jury Demand*                    *Page 15*

127.    Raytheon then hired an additional five employees for the same position in January 2022.

128.    Raytheon's hiring manager was Juan Franco, from Puerto Rico.

129.    Raytheon promoted Mr. Franco to a supervisor permanent employee position.

130.    The accounts payable support employees hired worked remotely.

131.    However, they reported to Raytheon's Richardson, Texas office.

132.    Mike Sheveland was the supervisor of the accounting RayTechs.

133.    Mr. Sheveland reported to Mr. Franco.

134.    Raytheon said that the temporary assignment was for one year, from September 2021 to September 2022.

135.    In July 2022, Mr. Franco had a meeting with all of the accounting RayTechs, which had dwindled to about 16 employees at that time because some had quit.

136.    Mr. Franco said that all of the remaining RayTechs, including the Accounting Plaintiffs would be offered permanent employee position, as long as the person had good attendance, good work habits, and got along with staff.

137.    Each of the Accounting Plaintiffs met these qualifications.

138.    In September 2022, Mr. Franco held another meeting and said that Raytheon required each application and to be interviewed.

139.    Mr. Franco said that the reason for the interview was so that there would be no favoritism.

140.    The reason did not make sense because if Raytheon kept with the original qualifications, there would not be any favoritism.

141.    Mr. Franco said that the permanent positions would be the same as the temporary positions, except that the employees would be permanent and eligible for benefits.

142.    Each of the Accounting Plaintiffs applied and interviewed for the permanent positions.

143.    Of the persons who applied, only about nine were accepted as permanent employees.

144.    Raytheon refused to accept any of the Black temporary employees, including the Accounting Plaintiffs.

145.    Raytheon did not give a reason.

146.    Raytheon terminated each of the Accounting Plaintiff, except for Ms. Davis.

147.    Raytheon did not accept Mr. Davis for the permanent position.

148.    Raytheon kept Ms. Davis in the temporary position, as a RayTech, because her responsibilities were different and Raytheon did not have a person trained to perform them.

149.    Raytheon required Ms. Davis to train her replacement.

**Heather Davis**

150.    Ms. Davis was hired on September 20, 2021.

151.    She experienced race discrimination almost immediately.

152.    The full list of employees who discriminated against her is known only by Raytheon at this time.

153.    Ms. Davis knows she was discriminated against by upper management and human resource professionals.

154.    Ms. Davis can see that it is systemic at Raytheon.

155.    Michael Sheveland, Ms. Davis's supervisor, originally intended to terminate Ms. Davis on December 31, 2022; however, on December 20, 2022, Mr. Sheveland asked Ms. Davis to stay until the end of January and did not provide Ms. Davis a scheduled termination date.

156.    Ms. Davis agreed.

157.    Ms. Davis reported to Raytheon its race discrimination, retaliation, and hostile work environment multiple times, both orally and in writing, to supervisors and to HR.

158.    She cannot remember every specific date and time she reported the discrimination, hostile work environment, and retaliation because there are too many.

159.    Ms. Davis does remember that reported discrimination on January 16, 2023, to Mr. Franco.

160.    Ms. Davis reported to Mr. Franco that all of the Black accounting employees were excluded from being made permanent employees.

161.    Ms. Davis reported that the decision was blatant discrimination.

162.    On January 16, 2023, Ms. Davis also reported the race discrimination to Whitney Rice-Richardson, an HR representative for Raytheon.

163.    Raytheon designated Rachel Slifka, another HR representative, to meet with Ms. Davis about the discrimination.

164.    Ms. Davis met with Ms. Slifka on January 17, 2023.

165.    Ms. Davis explained to Ms. Slifka that seven qualified Black RayTech employees including herself were blatantly discriminated against because of race, by being intentionally excluded during the hiring of permanent employees.

166. Ms. Davis reported to Ms. Slifka that Raytheon instead hired less qualified persons as the permanent employees who were not Black.

167. On January 19, 2023, Mr. Franco (Accounting Manager) and Mr. Sheveland (Ms. Davis's Supervisor) decided not to extend Ms. Davis's employment a second time and scheduled a termination date for January 31, 2023.

168. Raytheon did not schedule Ms. Davis's termination date until after she reported race discrimination to Raytheon.

169. Ms. Slifka indicated that the investigation could not be completed within the two-week period.

170. Ms. Davis confirmed to Ms. Slifka that she was not resigning.

171. Raytheon failed to act promptly in investigating and remedying the discrimination.

172. Raytheon's refusal to investigate timely is a retaliatory failure to remediate because termination is an adverse action and the uncorrected action of preventing the termination of employment would be of enough significance to qualify as an adverse action and the conduct would dissuade a reasonable worker from making or supporting a charge of discrimination.

173. Ms. Davis met with Mila West, another HR representative, on January 23, 2023.

174.    Ms. West instructed Ms. Davis not to retaliate against anyone, which she said including asking any witnesses if they were involved in the investigation.

175.    The instruction was Raytheon's way of intimidating Ms. Davis, keeping her from conducting her own investigation, and knowing whether Raytheon's investigation was a sham.

176.    Raytheon was retaliating against Ms. Davis yet instructed Ms. Davis not to retaliate after learning of her termination.

177.    Ms. Davis had not taken any retaliatory action and would not take any retaliatory action.

178.    Raytheon perceived Ms. Davis's additional complaint of discrimination made after learning about her termination as a retaliatory act.

179.    Ms. Davis's complaint was not retaliatory; it was protected activity.

180.    Raytheon's characterization of the protected activity as retaliatory is evidence of Raytheon's retaliation for Ms. Davis's protected activity.

181.    Ms. Davis informed Ms. West about the discrimination against all of the Black RayTechs.

182.    Ms. Davis informed Ms. West that Mr. Franco did not give her a reason for not becoming a permanent employee.

183.    Ms. Davis informed Ms. West that Mr. Franco instructed Ms. Davis to train her replacement.

184.    Ms. Davis informed Ms. West that her replacement was not Black and was far less qualified than Ms. Davis.

185.    Ms. Miles asked, "How did you find out that Raytheon hired the approximately nine less qualified non-Black employees.

186.    Ms. Davis responded that the Non-Black employees told her that they were hired as permanent employees.

187.    Ms. Miles asked Ms. Davis what she wanted to happen, the results she was seeking.

188.    Ms. Davis replied that she was hoping to be given the same equal employment opportunities the Non-Black employees.

189.    Ms. Davis reported in that meeting the discrimination against her and other Black employees.

190.    Raytheon recognized Ms. Davis's contributions by giving her a Spot Award for Accountability.

191.    Raytheon recognized Ms. Davis's contributions by giving her a Spot Award for Collaboration.

192.    Ms. Davis has a Bachelor's degree, a Master's in Business Administration, and an Associates Paralegal Degree.

193.    Ms. Davis's education far exceeds her replacement who is not Black and did not engage in protected activity.

194.    Ms. Davis's experience far exceeds her replacement who is not Black and did not engage in protected activity.

195.    Raytheon did not report back on any investigation of Ms. Davis's complaint.

196.    Raytheon has not rehired Ms. Davis or any of the other Accountant Plaintiffs.

197.    Raytheon engaged in a retaliatory failure-to-remediate which is actionable because failure to prevent termination is actionable.

**Latoya Stuart, Silvia Matthews, Marian Payne, and Billy Kelly**

198.    Ms. Stuart, Ms. Matthews, Ms. Payne, and Mr. Kelly were each replaced by persons who were not Black and less qualified than them.

199.    Raytheon has not articulated a reason for their termination.

200.    In continuing rather than eliminating retaliation, Plaintiffs became the persons being investigated rather than the persons or conduct being complained about.

201.   Raytheon managers, HR personnel, and investigators ignore the signs of discrimination and retaliation and do not respond to prevent the discrimination and retaliation.

**Policies Do Not Enforce Themselves**

202.   Raytheon has written polices created for the purpose of following laws against discrimination and retaliation.

203.   Raytheon knows that the written polices do not enforce themselves.

204.   Raytheon' policies promised to protect Plaintiffs from discrimination and retaliation.

205.   Raytheon violated its own policies by discriminating and retaliating against Plaintiffs.

206.   Raytheon breached its promise to protect Plaintiffs from discrimination and retaliation.

207.   While this complaint provides sufficient detail to give notice of plausible claims of discrimination and retaliation, it does not contain all of the facts that may be presented at trial.

**THE FACT FINDER'S CHOICE**

208.   The factfinder must make the choice and decide whether:

    a.   the Plaintiffs telling the not telling the truth;

b.    the Plaintiffs are just basing their claims on beliefs, feelings, or thoughts;

c.    the Plaintiffs are merely speculation;

d.    Raytheon is telling the truth;

e.    Raytheon is acting in good faith;

f.    Raytheon has witnesses to support its defense;

g.    Raytheon has documents to support its defense;

h.    the Plaintiffs are believable;

i.    the Plaintiffs have other witnesses to support their claims;

j.    the Plaintiffs have documents to support their claims;

k.    Raytheon is not telling the truth;

l.    Raytheon knows that it discriminates and retaliates; or

m.    Raytheon is covering up the discrimination and retaliation.

**CAUSES OF ACTION**

**Violation of the Civil Rights Act of 1866**

209.    Plaintiffs' claims for recovery under the Civil Rights Act of 1866 is based upon 42 U.S.C. § 1981, which provides that all persons within the United States shall have the same right to make and enforce contracts and to the full and equal benefit of all laws as is enjoyed by white citizens.

210.    This law entitles a person of color to equal opportunity and treatment in employment or other contractual relationships.

211.    The Civil Rights Act of 1866 is a centerpiece legislation in our country, founded upon the self-evident truth that all of us are created equal and endowed by their maker with certain inalienable rights, among them life, liberty, and the pursuit of happiness.

212.    Making a living is foundational to the pursuit of happiness in America.

213.    As recognized in our civil war over this principle, our country is dedicated to the proposition that all of us are created equal.

214.    The Civil Rights Act of 1866 was passed to give effect to the Thirteenth Amendment.

215.    The Civil Rights Act of 1866 became the blueprint for the Fourteenth Amendment.

216.    In our time, Martin Luther King, Jr. dreamed that one day our country would rise up and live out the meaning of its creed, that all of us are created equal.

217.    The Civil Rights Act of 1866 is the shining star that reflects the ideal of our country at its core.

218.   Our creed is not just embodied in a declaration, a speech, or a sermon, but in law and commerce where it matters, through the Civil Rights Act of 1866 by those with the courage to enforce it.

219.   The statue is enforced by those who are not afraid to upset the status quo, to stop the perpetual system of discrimination and retaliation, of unfairness and injustice.

220.   Under the Civil Rights Act of 1866, when an employer or contractor acts adversely against a person of color because of that person's race, the law has been violated and the person of color may file a suit and recover damages.

221.   A person is also entitled to file suit and recover damages under the Civil Rights Act of 1866 for retaliation for opposing or reporting violations of the Civil Rights Act of 1866, or for participating in an investigation of a violation of the Civil Rights Act of 1866.

222.   Raytheon has a pattern and practice of discriminating based on race and retaliating against those who oppose or report discrimination.

223.   Ms. Davis opposed Raytheon denying persons the "right to make" contracts and denying the same "security of persons and property as is enjoyed by white citizens" in the United States as required by federal law. *See* 42 U.S.C. § 1981.

224.    Raytheon treated Ms. Davis adversely after she opposed and reported unlawful discrimination.

225.    Raytheon engaged in material adverse actions against Ms. Davis, that might well dissuade a reasonable person from opposing or reporting the discrimination had they known they would face the adverse actions.

226.    The termination of the contractual relationship was not only discriminatory, but it was also retaliatory as to Ms. Davis.

227.    Raytheon violated the federal statute by intentionally discriminating against Plaintiffs and retaliating against Ms. Davis; and, as a direct result caused damages to Plaintiffs.

228.    The liability can be either actual or constructive under the *McDonnell Douglas* framework.

229.    Raytheon knew or should have known that its White employees were discriminating against African Americans and taken corrective action to prevent the discrimination within its control.

**Compensatory and Equitable Relief**

230.    Plaintiffs sustained damages, including lost wages and benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life, and other nonpecuniary losses for which they are entitled to recovery under their causes of action.

231.    Plaintiffs are also entitled to declaratory relief that a violation has occurred.

232.    Plaintiffs are also entitled to equitable relief in the form of reinstatement and an injunction against future discrimination or retaliation.

**Attorneys' Fees**

233.    Plaintiffs are also entitled to attorneys' fees, interest, and costs of court for services rendered in this cause, including trials and appeals.

**Exemplary Damages**

234.    Plaintiffs are also entitled to receive punitive damages because Raytheon engaged in a discriminatory or retaliatory practice or in discriminatory or retaliatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

## JURY DEMAND

235.    Plaintiffs request a trial by jury to the extent allowed by law.

WHEREFORE, Plaintiffs requests that Defendant Raytheon answer and that on final trial, Plaintiffs have judgment against Defendants for compensatory, declaratory and equitable relief, and exemplary damages, attorneys' and expert fees,

costs of suit, and interest as provided by law, and any further relief to which they may be entitled.

Respectfully submitted,

*/s/ Brian P. Sanford*
Brian P. Sanford
Texas Bar No. 17630700
bsanford@sanfordfirm.com
Elizbeth "BB" Sanford
Texas Bar No. 24100618
esanford@sanfordfirm.com

THE SANFORD FIRM
1910 Pacific Ave., Suite 15400
Dallas, TX 75201
Ph:  (214) 717-6653
Fax: (214) 919-0113

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2024, I electronically served the foregoing document on all counsel of record via the Court's electronic filing system.

*/s/ Brian P. Sanford*